**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ANUP ENGQUIST,
          *Plaintiff-Appellee,*

v.

OREGON DEPARTMENT OF
AGRICULTURE; JOSEPH (JEFF) HYATT;
JOHN SZCZEPANSKI,
          *Defendants-Appellants.*

No. 05-35170
D.C. No.
CV 02-1637 AS

ANUP ENGQUIST,
          *Plaintiff-Appellant,*

v.

OREGON DEPARTMENT OF
AGRICULTURE; JOSEPH (JEFF) HYATT;
JOHN SZCZEPANSKI,
          *Defendants-Appellees.*

No. 05-35263
D.C. No.
CV 02-1637 AS
OPINION

Appeals from the United States District Court
for the District of Oregon
Donald C. Ashmanskas, Magistrate Judge, Presiding

Argued and Submitted
July 27, 2006—Portland, Oregon

Filed February 8, 2007

Before: Stephen Reinhardt, A. Wallace Tashima, and
Susan P. Graber, Circuit Judges.

Opinion by Judge Tashima;
Dissent of Judge Reinhardt

1501

**COUNSEL**

Loren W. Collins, Senior Assistant Attorney General, and Julie A. Smith, Assistant Attorney General, Oregon Department of Justice, Salem, Oregon, for defendants-appellants and cross-appellees.

Stephen L. Brischetto, Portland, Oregon, for plaintiff-appellee and cross-appellant.

**OPINION**

TASHIMA, Circuit Judge:

Plaintiff Anup Engquist ("Engquist") brought suit alleging violations of federal anti-discrimination law, constitutional law, and state tort law against her former employer, the Oregon Department of Agriculture ("ODA") and John Szczepanski ("Szczepanski") and Joseph Hyatt ("Hyatt"). A jury found the individual defendants liable for constitutional violations of equal protection and substantive due process, and for intentional interference with contract. The jury awarded Engquist $175,000 in compensatory damages and $250,000 in punitive damages. Pursuant to Oregon law, $75,000 of the punitive damages were allocated to Oregon's Criminal Injuries Com-

pensation Account ("State Account"). Szczepanski and Hyatt (collectively "Defendants") appeal, contending that the constitutional claims are invalid as a matter of law. Engquist cross-appeals, contending that a jury verdict from a coworker's similar trial in state court should have been given preclusive effect, or that it should have been admitted into evidence. She also challenges the allocation of $75,000 of the punitive damages awarded to her to the State Account. We have jurisdiction over the appeal and cross-appeal under 28 U.S.C. § 1291. We hold that Engquist's constitutional claims are invalid as a matter of law, and remand the case to the district court to adjust Engquist's damages and attorneys' fees awards in light of that holding. We affirm on Engquist's cross-appeal.

## FACTUAL BACKGROUND

Engquist was hired in 1992 as an international food standards specialist for the Export Service Center ("ESC"), a laboratory in the ODA. She was hired by Norma Corristan ("Corristan"), who was the director of the ODA's Laboratory Services Division ("LSD"), which included the ESC. Engquist's initial responsibility was to develop a database of food regulations for different countries, but she later focused on marketing the ESC's certification services and consulting with clients.

Hyatt had been employed by the ODA since 1990, and worked in the LSD from 1990 to 2000 as a systems analyst. Engquist had repeated difficulties with Hyatt, and complained to Corristan several times that Hyatt excessively monitored her and made false statements about her. Corristan responded to complaints from Engquist and others about Hyatt by meeting with his supervisor, and requiring him to attend diversity and anger management training.

In June 2001, Szczepanski, who was an Assistant Director of the ODA, took over oversight of the ESC, and sought to fill

the vacant ESC manager position. During the summer of 2001, Szczepanski told a client that he could not "control" Engquist, and that Engquist and Corristan "would be gotten rid of." In the fall of 2001, Hyatt told a co-worker that he and Szczepanski were working to "get rid of" Corristan and Engquist. Hyatt drafted a plan to reorganize the ESC, and emailed it to Szczepanski, and Szczepanski subsequently implemented it. Engquist and Hyatt both applied for the ESC manager position. Although Engquist had a more extensive educational background and more experience with the customer-service aspects of the position, Hyatt was offered the position effective October 2001. Szczepanski defended that decision by explaining that he chose Hyatt because of Hyatt's business experience and work as a chemist at the ODA.

On October 5, 2001, the Governor announced that the state was experiencing a budget crisis and called for budget reductions. Soon afterwards, Szczepanski eliminated Corristan's position, allegedly because of the budget crisis. Near the end of 2001, Hyatt told a former ODA employee, then an ESC client, that Corristan and Engquist had run the ESC "into the ground," they were on their way out, and he would take over and put it all back together. On January 31, 2002, Engquist was informed that her position was being eliminated due to the reorganization. Pursuant to her collective bargaining agreement ("CBA"), Engquist was given the opportunity to "bump" into another position. Engquist, however, was found unqualified for the only position at her level, and thus was unable to "bump" into it.

Since being laid off, Engquist has applied for approximately 200 jobs, but has not been offered a full-time job. She started her own food consulting business, doing the same type of work she did at the ESC. This business, though, does not pay enough to sustain her, and may be losing money. Defendants' vocational expert testified that there are very few opportunities in Oregon for work in Engquist's fields — microbiology, food technology, and food science. Engquist's

vocational expert testified that it was not probable that Engquist would find employment in her occupation.

Prior to Engquist's trial, Corristan successfully filed suit against Defendants in state court, and a jury awarded Corristan $1.1 million in damages. That jury found that Hyatt discriminated against Corristan because of her gender or ethnicity, and that Defendants violated her equal protection and procedural due process rights.

## PROCEDURAL BACKGROUND

In her complaint, Enguist alleged claims under Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e *et seq.*), 42 U.S.C. § 1981, equal protection, procedural and substantive due process, and intentional interference with contract. She sought economic, non-economic, and punitive damages, as well as attorneys' fees and costs. Defendants moved for summary judgment on all the claims. The district court granted the motion as to the sexual harassment and procedural due process claims, and denied it with respect to the remaining claims. Defendants made a second motion for summary judgment, specifically challenging Engquist's use of the "class-of-one" theory of equal protection. The court denied the motion, concluding that the claim was viable.

The district court rejected Engquist's request that the court give preclusive effect to the jury finding of discrimination in Corristan's state court lawsuit against Defendants. The district court granted Defendants' motion in limine to exclude from evidence the verdict in Corristan's state court case.

The remaining claims proceeded to an 11-day jury trial. After Engquist rested her case-in-chief, defendants moved for judgment as a matter of law, again challenging the equal protection and substantive due process claims. Defendants also asserted that they were entitled to qualified immunity on the constitutional claims. The district court denied the motions.

Defendants renewed their motions after the close of evidence, and the court again denied them. Defendants also objected to the jury instructions on the constitutional claims, arguing that those claims should not have been submitted to the jury. Those objections were overruled.

The jury concluded that Defendants were liable for violations of equal protection and substantive due process, as well as on the contract interference claim. The jury rejected Engquist's Title VII and § 1981 claims against all Defendants. The jury awarded Engquist $175,000 in compensatory damages, which were not specifically tied to any particular successful claim. The jury awarded Engquist $125,000 in punitive damages on the equal protection claim, and $125,000 in punitive damages on the contract interference claim.

Following the verdict, Defendants filed a motion for judgment notwithstanding the verdict, which the court denied. In addition, Engquist objected to the form of the judgment, presumably because the judgment listed the State of Oregon as a judgment creditor, but the district court overruled her objection. The court entered judgment in favor of Engquist, which consisted of $175,000 in compensatory damages and $175,000 in punitive damages. The court entered judgment in favor of the State Account in the amount of $75,000, or 60 percent of the punitive damages awarded on the state tort claim, pursuant to Or. Rev. Stat. § 31.735. The court also awarded Engquist $172,740 in attorneys' fees, as well as costs. Defendants timely filed a notice of appeal, and Engquist timely filed her notice of cross-appeal.

## STANDARD OF REVIEW

We review *de novo* a district court's denial of a motion for judgment as a matter of law. *Janes v. Wal-Mart Stores Inc.*, 279 F.3d 883, 886 (9th Cir. 2002). We also review constitutional claims *de novo*. *Masnauskas v. Gonzales*, 432 F.3d 1067, 1069 (9th Cir. 2005). We review a jury verdict under

the substantial evidence standard. *Gilbrook v. City of Westminster*, 177 F.3d 839, 856 (9th Cir. 1999). "Substantial evidence" is evidence that a reasonable mind might accept as adequate to support a conclusion. *Id.*

## ANALYSIS

## I.   Equal Protection

This case presents several issues of first impression in this circuit, the first of which is whether the class-of-one theory of equal protection is applicable to public employment decisions. The jury concluded that Defendants were liable on the equal protection claim because Defendants "intentionally treat[ed] the plaintiff differently than others similarly situated with respect to the denial of her promotion, termination of her employment, or denial of bumping rights without any rational basis and solely for arbitrary, vindictive, or malicious reasons." Defendants contend that Engquist's claim fails as a matter of law, because the class-of-one theory is not applicable to the claims of public employees.

We begin by examining the Supreme Court's articulation of the class-of-one theory and its application by the circuit courts. Ultimately, we hold that the class-of-one theory of equal protection is not applicable to decisions made by public employers.

## A.   Olech *and the Class of One*

[1] "The Equal Protection Clause ensures that 'all persons similarly situated should be treated alike.'" *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 944 (9th Cir. 2004) (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985)), *rehearing denied*, 395 F.3d 1062 (9th Cir. 2005). The Supreme Court formally recognized class-of-one equal protection actions in *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (per curiam). In *Olech*, a munici-

pality conditioned water service for a property on the plaintiff-owner's granting a 33-foot easement, even though it required only a 15-foot easement from every other property owner. *Id.* at 563. In a short, per curiam opinion, the Court allowed the plaintiff to proceed on the class-of-one theory, recognizing claims where a "plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.* at 564. The Court stated that allegations of irrational and wholly arbitrary treatment, even without allegations of improper subjective motive, were sufficient to state a claim for relief under equal protection analysis. *Id.* at 565.

In a three-paragraph concurrence, Justice Breyer expressed concern that *Olech* would transform ordinary violations of state or local law into constitutional cases. *See id.* at 565-66. He nonetheless concurred in the judgment because the plaintiff had alleged that city officials acted with malice or ill will, which distinguished the claim from run-of-the-mill zoning cases. *Id.* at 566.

**[2]** Based on *Olech*, we have applied the class-of-one theory in the regulatory land-use context to forbid government actions that are arbitrary, irrational, or malicious. *See Squaw Valley*, 375 F.3d at 944-48; *see also Valley Outdoor, Inc. v. City of Riverside*, 446 F.3d 948, 955 (9th Cir. 2006) (applying class-of-one theory to city's denial of billboard permits). In *Squaw Valley*, the plaintiffs, who operated a ski resort, claimed that two employees working for the state water quality authority subjected them to selective and over-zealous regulatory oversight. 375 F.3d at 938. We applied rational basis scrutiny to review the acts of the government regulators. *Id.* at 944. We held that acts that are malicious, irrational, or plainly arbitrary do not have a rational basis. *Id.* In addition, we held that in an equal protection claim based on selective enforcement of the law, a plaintiff can show that a defendant's alleged rational basis for his acts is a pretext for an impermissible motive. *Id.*

**[3]** We reversed a grant of summary judgment in favor of defendant Singer because, even though the defendants had set forth a rational basis for their acts, there was evidence that Singer acted out of animosity against the plaintiffs. *Id.* at 946-47. In contrast, we sustained the grant of summary judgment in favor of defendant Goldberg because we found no evidence that Goldberg acted with animosity. *Id.* at 947-48. We have not yet decided, however, whether the class-of-one theory should be extended to public employment decisions.

Other courts of appeals have chosen to apply *Olech*'s class-of-one theory to public employment decisions. *See, e.g.*, *Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250, 260-61 (6th Cir. 2006); *Hill v. Borough of Kitztown*, 455 F.3d 225, 239 (3d Cir.. 2006); *Whiting v. Univ. of Miss.*, 451 F.3d 339, 348-50 (5th Cir. 2006); *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005); *Levenstein v. Salafsky*, 414 F.3d 767, 775-76 (7th Cir. 2005); *Campagna v. Mass. Dep't of Envtl. Prot.*, 334 F.3d 150, 156 (1st Cir. 2003); *Bartell v. Aurora Pub. Sch.*, 263 F.3d 1143, 1148-49 (10th Cir. 2001). Courts, however, have "struggled to define the contours of class-of-one cases" because, unless constrained, the class-of-one theory of equal protection claim could provide a federal cause of action for review of almost every executive or administrative government decision. *Jennings v. City of Stillwater*, 383 F.3d 1199, 1210-11 (10th Cir. 2004).[1] Thus, although courts have recognized class-of-one employment claims, they have almost always ultimately concluded that the particular claim before them was insufficient. *See, e.g.*, *Neilson*, 409 F.3d at 106;

---

[1]Following Justice Breyer's lead, some courts have limited class-of-one claims by requiring a showing of malice or animus as an element of the claim, but other courts have refused to do so. *See Jicarilla Apache Nation v. Rio Arriba County*, 440 F.3d 1202, 1209-10 (10th Cir. 2006) (recognizing split and collecting cases). Neither party in this case has argued that malice or animus is an element of class-of-one employment claims. We note, however, that such a requirement would be inconsistent with both the Court's opinion in *Olech* and our holding in *Squaw Valley*. *See Olech*, 528 U.S. at 565; *Squaw Valley*, 375 F.3d at 944.

*Bartell*, 263 F.3d at 1149. Because of this understandable hesitancy, the Seventh Circuit recently noted that it was "not surprised to have found no 'class of one' cases in which a public employee has prevailed since the extreme case that kicked off the 'class of one' movement more than two decades ago." *Lauth v. McCollum*, 424 F.3d 631, 633-34 (7th Cir. 2005) (citations omitted) (collecting cases).[2] Engquist's thus-far successful claim on this theory thus presents a unique case.

## B.  Applying   the   Class-of-One   Theory   to   Public Employment

Whether to apply the class-of-one theory to decisions of public employers presents a significantly different question than whether to apply it to legislative or regulatory acts of government. In general, there is a distinction between the "government acting 'as a proprietor' that was managing 'its own internal affairs' rather than as a 'lawmaker' that was attempting 'to regulate or license.'" *Singleton v. Cecil*, 176 F.3d 419, 425 (8th Cir. 1999) (en banc) (quoting *Cafeteria & Rest. Workers Union, Local 473 v. McElroy*, 367 U.S. 886, 896 (1961) (alterations omitted)). The Supreme Court has always assumed that "the government as employer indeed has far broader powers than does the government as sovereign." *Waters v. Churchill*, 511 U.S. 661, 671 (1994) (O'Connor, J., plurality opinion) (discussing difference in government ability to restrict speech).

[4] Because the government as employer has broader powers than the government as regulator, the scope of judicial review is correspondingly restricted. Accordingly, the Supreme Court has warned that "[t]he federal court is not the appropriate forum in which to review the multitude of person-

---

[2]That "extreme case" was "*Ciechon v. Chicago*, 686 F.2d 511 (7th Cir. 1982), where a paramedic was made a scapegoat for conduct that had drawn the wrath of the local media, while her identically situated partner received no disciplinary sanction at all." *Lauth*, 424 F.3d at 634.

nel decisions that are made daily by public agencies," and therefore the Constitution cannot be interpreted to require judicial review of every such decision. *Bishop v. Wood*, 426 U.S. 341, 349-50 (1976) (rejecting due process claim where the plaintiff is fired from public employment for reasons either false or mistaken).

In other areas of constitutional law, the Court has limited the rights of public employees as compared to ordinary citizens. For instance, in the First Amendment context, courts review restrictions on employees' speech with greater deference in order to balance the government employer's legitimate interests in its mission. *See Garcetti v. Ceballos*, 126 S. Ct. 1951, 1960 (2006) (holding that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline"); *City of San Diego v. Roe*, 543 U.S. 77, 80-82 (2004) (per curiam) (applying balancing test drawn from *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)). Similarly, in the Fourth Amendment context, the government, as employer, need not obtain a warrant to search an employee's property because imposing such a requirement unduly burdens government business and improperly transforms everyday business incidents into constitutional matters. *O'Connor v. Ortega*, 480 U.S. 709, 721-22 (1987) (O'Connor, J., plurality opinion).

**[5]** The class-of-one theory of equal protection is another constitutional area where the rights of public employees should not be as expansive as the rights of ordinary citizens. The paradigmatic class-of-one case should be one in which a public official, for some improper motive, "comes down hard on a hapless private citizen." *Lauth*, 424 F.3d at 633. This was the type of case decided in *Olech* and *Squaw Valley*. In contrast, when a public employee is subjected to unequal treatment at work for arbitrary reasons, the need for federal judicial review under equal protection "is especially thin"

given the number of other legal protections that public employees enjoy. *See id.*

A judicially-imposed constitutional proscription of arbitrary public employer actions would also upset long-standing personnel practices. Although arbitrary government acts are unreasonable in the legislative or regulatory context, employers have traditionally possessed broad discretionary authority in the employment context. The power of employers to discharge employees for reasons that may appear arbitrary, unless constrained by contract or statute, is well-established under the common law of at-will employment. *See NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 273-74 (1975) (describing common law); *Andrews v. Louisville & Nashville R.R.*, 406 U.S. 320, 324 (1972) (same). Applying equal protection to forbid arbitrary or malicious firings of public employees would completely invalidate the practice of public at-will employment. *See Singleton*, 176 F.3d at 428. We decline to effect such a significant change in employment law under the general provisions of the Fourteenth Amendment. *See Waters*, 511 U.S. at 679 ("[A]n at-will government employee . . . generally has no claim based on the Constitution at all.").[3]

In addition to significantly altering traditional personnel practices, applying the class-of-one theory to public employment would also generate a flood of new cases, requiring the federal courts to decide whether any public employee was fired for an arbitrary reason or a rational one. *See Jennings*, 383 F.3d at 1211. The theory would apply not only to discharges, but also to other employment actions, such as promotions, disciplinary actions, and decisions about pay, benefits and transfers. Contrary to the Supreme Court's admonition,

---

[3]If an employee is not an at-will employee, then there is already protection against arbitrary firings, such as in civil service regulations or a CBA, which lessens the need for constitutional protection. *See Lauth*, 424 F.3d at 633. In this case, for whatever reason, there is nothing in the record to indicate that Engquist challenged her dismissal under the applicable CBA.

federal courts would be required to "review the multitude of personnel decisions that are made daily by public agencies." *Bishop*, 426 U.S. at 349.

**[6]** Finally, we believe that *Olech* is too slender a reed on which to base such a transformation of public employment law. "It seems unlikely that the Supreme Court intended such a dramatic result in its *per curiam* opinion in *Olech*." *Campagna v. Mass. Dep't of Envtl. Prot.*, 206 F. Supp. 2d 120, 127 (D. Mass. 2002), *aff'd*, 334 F.3d 150 (1st Cir. 2003). Accordingly, we hold that the class-of-one theory of equal protection is inapplicable to decisions made by public employers with regard to their employees. We therefore reverse the judgment in favor of Engquist on her equal protection claim.[4]

## II.    Substantive Due Process

**[7]** This case also presents a novel due process issue for this circuit: what showing is required in a substantive due process claim based on the right to pursue a particular profession. The jury concluded that Defendants were liable on the substantive due process claim because they "subject[ed] plaintiff to arbitrary and unreasonable government actions causing plaintiff to be unable to pursue her profession." Defendants contend that, as a matter of law, they cannot be held liable under substantive due process for violating this right. In the alternative, they contend that Engquist did not present sufficient evidence to demonstrate that their actions deprived her of the ability to pursue her profession.[5]

---

[4]Because we conclude that Engquist's class-of-one claim is invalid, we need not reach Defendants' contention that they are entitled to qualified immunity under *Saucier v. Katz*, 533 U.S. 194, 201 (2001). *See Squaw Valley*, 375 F.3d at 943.

[5]Engquist contends that Defendants have waived these arguments because the court accepted their proposed jury instructions for the claim. In fact, Defendants challenged the legal validity of the claim repeatedly and proposed jury instructions only in case the court rejected their legal

We hold that Engquist has stated a valid claim — a claim upon which relief can be granted — under substantive due process by alleging that Defendants' actions prevented her from pursuing her profession. We conclude, however, that Engquist's claim fails as a matter of law because she did not present sufficient evidence that Defendants' actions were responsible for her inability to pursue her profession.

## A.    *Nature of the Protected Right*

"The substantive component of the Due Process Clause forbids the government from depriving a person of life, liberty, or property in such a way that . . . interferes with rights implicit in the concept of ordered liberty." *Squaw Valley*, 375 F.3d at 948 (internal quotation marks omitted). "A threshold requirement to a substantive or procedural due process claim is the plaintiff's showing of a liberty or property interest protected by the Constitution." *Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56, 62 (9th Cir. 1994). As discussed above, most courts have rejected the claim that substantive due process protects the right to a particular public employment position, and we have yet to decide the issue. *See Nicholas v. Pa. State Univ.*, 227 F.3d 133, 142-43 (3d Cir. 2000); *Dias*, 436 F.3d at 1131 n.3. Engquist, however, premised her

---

arguments. Therefore, Defendants have not waived these arguments. Engquist also argues that some particular arguments were waived because they were not raised below. Even assuming such waiver, however, we will consider them because these arguments are intertwined with the validity of the claim. *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law."). In addition, where an issue is purely legal, and the other party would not be prejudiced, we can consider an issue not raised below. *See Kimes v. Stone*, 84 F.3d 1121, 1126 (9th Cir. 1996). Here the issues are purely legal and were fully briefed by Engquist; therefore, we exercise our discretion to consider these arguments.

claim on interference with her ability to pursue a profession altogether.

**[8]** The Supreme Court has not specified the boundaries of the right to pursue a profession, but has identified it generally. *See Conn v. Gabbert*, 526 U.S. 286, 291-92 (1999) (stating that there is "some generalized due process right to choose one's field of private employment"). The Court has noted, however, that cases recognizing the right "all deal with a complete prohibition of the right to engage in a calling, and not [a] sort of brief interruption." *Id.* at 292. We have recognized the liberty interest in pursuing an occupation of one's choice. *See Dittman v. California*, 191 F.3d 1020, 1029-30 (9th Cir. 1999). We have held that a plaintiff can make out a substantive due process claim if she is unable to pursue an occupation and this inability is caused by government actions that were arbitrary and lacking a rational basis. *Sagana v. Tenorio*, 384 F.3d 731, 742-43 (9th Cir. 2004), *cert. denied*, 543 U.S. 1149 (2005); *Dittman*, 191 F.3d at 1030; *Wedges/ Ledges*, 24 F.3d at 65. *But see Zorzi v. County of Putnam*, 30 F.3d 885, 895 (7th Cir. 1994) (holding that this occupational liberty is protected only by procedural due process rights, and not substantive due process).

All of our cases recognizing this substantive due process right dealt with government legislation or regulation, and not the acts of a government as an employer, which allegedly prevented the plaintiff from pursuing a specific profession. *See Sagana*, 384 F.3d at 733, 743 (challenging commonwealth law implementing temporary immigrant labor program); *Dittman*, 191 F.3d at 1029-33 (challenging state law imposing conditions on acupuncture licenses); *Wedges/Ledges*, 24 F.3d at 65-66 (challenging city ordinance that banned new licenses for particular arcade games); *FDIC v. Henderson*, 940 F.2d 465, 474 (9th Cir. 1991) (challenging state regulatory refusal to license a new bank). As discussed above, constitutional review of government employer decisions is more constrained than the review of legislative or regulatory ones. *See* Part I.B,

*supra.* Defendants thus argue that there should be no substantive due process review of employment decisions, and there is some support for that proposition. *See Singleton*, 176 F.3d at 428 (holding that in the public employment context, an employee's occupational liberty is not protected by substantive due process, but only by procedural due process).[6]

[9] We decline to hold that there is no substantive due process claim for a public employer's violations of occupational liberty. Rather, we limit the claim to extreme cases, such as a "government blacklist, which when circulated or otherwise publicized to prospective employers effectively excludes the blacklisted individual from his occupation, much as if the government had yanked the license of an individual in an occupation that requires licensure." *Olivieri v. Rodriguez*, 122 F.3d 406, 408 (7th Cir. 1997). Such a governmental act would threaten the same right as a legislative action that effectively banned a person from a profession, and thus calls for the same level of constitutional protection. The concerns about federal courts reviewing every public employee discharge, *see Singleton*, 176 F.3d at 428-29, are not implicated because such a claim is colorable only in extreme cases. Nor does such a standard, unlike the class-of-one theory, affect the vast majority of public employer decisions.

[10] As we have already recognized that the right to pursue a chosen profession is protected by substantive due process in the legislative context, we believe that the right should also be

---

[6]In support of her claim, Engquist cites several cases that are unhelpful because they involve procedural rather than substantive due process. *See DiMartini v. Ferrin*, 889 F.2d 922, 927-29 (9th Cir. 1989), *as amended by* 906 F.2d 465; *Brady v. Gebbie*, 859 F.2d 1543, 1552-53 (9th Cir. 1988); *Merritt v. Mackey*, 827 F.2d 1368, 1372 (9th Cir. 1987). These cases help establish that the right to pursue a profession is a protected liberty interest, but are unhelpful with respect to substantive due process protection. *Benigni v. City of Hemet*, 879 F.2d 473, 478 (9th Cir. 1988), may have involved substantive due process, but was based on abusive police conduct, and therefore provides little guidance.

protected in the public employment context. Therefore, we hold that there is substantive due process protection against government employer actions that foreclose access to a particular profession to the same degree as government regulation.[7]

## B.    Sufficiency of the Evidence

Having identified the contours of the substantive due process right, we next turn to the question of whether Engquist's evidence at trial satisfied this standard. Defendants contend that the evidence was insufficient to show that Engquist was deprived of her right to pursue a profession. We agree.

[11] We have not previously articulated how much interference with someone's job prospects constitutes a denial of the right to pursue a profession. On this question, we find useful the Seventh Circuit's standard that in order to bring an occupational liberty claim, a plaintiff must show that the "character and circumstances of a public employer's stigmatizing conduct or statements are such as to have destroyed an employee's freedom to take advantage of other employment opportunities." *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 531 (7th Cir. 2000). "It is not enough that the employer's stigmatizing conduct has some adverse effect on the employee's job prospects; instead, the employee must show that the stigmatizing actions make it virtually impossi-

---

[7]Defendants argue that Engquist's substantive due process claim is preempted by her class-of-one equal protection claim because it more specifically addresses her theory of liability. *See Armendariz v. Penman*, 75 F.3d 1311, 1325-26 (9th Cir. 1996) (en banc) ("Substantive due process analysis has no place in contexts already addressed by explicit textual provisions of constitutional protection, regardless of whether the plaintiff's potential claims under those amendments have merit."); *Squaw Valley*, 375 F.3d at 949-50 (holding that substantive due process claims based on government interference with property rights are preempted by the Takings Clause). Because we have held that the class-of-one theory is inapplicable in the employment context, *see* Part I, *supra*, Engquist's due process claim is not preempted.

ble for the employee to find new employment in his chosen field." *Id.* (internal quotation marks omitted).

**[12]** Under this standard, only employer actions that affect a plaintiff's occupational prospects to the same degree as government legislation are actionable under a substantive due process theory. Thus, it comports with our cases in the legislative context. *See Dittman*, 191 F.3d at 1029 (holding that a law that imposes a " 'complete prohibition' on entry into a profession . . . implicates a person's liberty interest in pursuing an occupation or profession of her choice"). The standard also ensures that substantive due process protects the right to pursue an entire profession, and not the right to pursue a particular job. Accordingly, we adopt the standard set forth in *Bordelon*.

**[13]** In this case, Engquist presented evidence that Defendants made defamatory statements to two or three other people in the industry. In addition, Engquist presented evidence that she was having much difficulty finding a job in the same field in Oregon, and that such difficulty would likely continue. Engquist, however, did not demonstrate that Defendants' actions caused her job-search difficulties. There was no proof that Defendants' defamatory comments affected opportunities with those clients, or any other possible employer. Even under the substantial evidence standard, *see Gilbrook*, 177 F.3d at 856, there was no evidence that her reputation had been publicly damaged by Defendants such that they reduced her employment options. Instead, it appears that Engquist works in a highly specialized field, and there simply are not many jobs available in that field in Oregon. Because Defendants did not cause this situation, their specific actions have not made it "virtually impossible" for Engquist to find new employment. *See Bordelon*, 233 F.3d at 531. Therefore, we conclude that Engquist did not present sufficient evidence to sustain her substantive due process claim.[8] Consequently, we

---

[8]Defendants argue that if there is an available substantive due process claim, pretext is not part of the inquiry. In our substantive due process

reverse the judgment in favor of Engquist on her substantive due process claim.[9]

### III.    Engquist's Damages and Attorneys' Fees

[14] Because we reverse the judgment in favor of Engquist on her constitutional claims, the damages award and attorneys' fees award must be vacated. The compensatory damages may be unaffected because the jury also found in favor of Engquist on the interference with contract tort claim and did not allocate its award of compensatory damages to any particular claim, or between claims. The punitive damages awarded for the equal protection claim, however, cannot stand. Additionally, the district court's award of attorneys' fees can no longer be based on 42 U.S.C. § 1988. *See Mateyko v. Felix*, 924 F.2d 824, 828 (9th Cir. 1990) (holding that a plaintiff who succeeds on a state claim, but on none of her constitutional claims, is not a "prevailing party" under § 1988).[10] Accordingly, we vacate the awards of damages and attorneys' fees, and remand to the district court to decide how to adjust Engquist's damages and attorneys' fees awards.

decisions regarding occupational liberty, we did not question whether the government's proffered justification was a pretext. *See, e.g.*, *Wedges/ Ledges*, 24 F.3d at 66 ("[W]e do not require that the government's action actually advance its stated purposes, but merely look to see whether the government *could* have had a legitimate reason for acting as it did."). These cases all involved legislation, however, and an inquiry into pretext may be appropriate in the employment context. Regardless, we need not decide the issue as we have held that Engquist has not shown that she was deprived of her right to occupational liberty. *See Dittman*, 191 F.3d at 1029-31 (inquiring into the justification for an action only after holding that the plaintiff was deprived of her liberty interest).

[9]Because we conclude that Engquist's due process claim is invalid, we need not reach Defendants' contention that they are entitled to qualified immunity. *See* footnote 4, *supra*.

[10]We express no opinion as to whether Engquist is entitled to attorneys' fees under Oregon law.

### IV.    Oregon's Punitive Damages Allocation Statute

Pursuant to Or. Rev. Stat. § 31.735, the district court entered judgment in favor of the State Account in an amount equal to 60 percent of the punitive damages award. The punitive damages award for the federal, *i.e.*, equal protection claim, was not subject to the § 31.735 allocation, but only the punitive damages award for the state law tort claim of contract interference. Engquist's primary contention on cross-appeal is that § 31.735 violates the Fifth Amendment's Takings Clause and the Excessive Fines Clause of the Eighth Amendment.[11]

### A.    Judicial Estoppel

Engquist's first argument is that the doctrine of judicial estoppel prevents the Oregon Justice Department from collecting funds for the State Account because the Department, as Defendants' counsel, previously denied liability for punitive damages. We review the district court's decision not to invoke judicial estoppel for an abuse of discretion. *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001).

Judicial estoppel prevents a party from taking inconsistent positions when those inconsistencies have an adverse effect on the judicial process. *United States v. Miguel*, 338 F.3d 995,

---

[11]As an initial matter, Defendants contend that Engquist's challenges are unripe. We can readily dispense with this argument. "Ripeness analysis has two prongs: the fitness of the issue for judicial review and the hardship to the parties if review is withheld." *Gemtel Corp. v. Cmty. Redev. Agency*, 23 F.3d 1542, 1545 (9th Cir. 1994). A claim is fit for decision if the issues are primarily legal, do not require further factual development, and challenge a final action. *Verizon Cal. Inc. v. Peevey*, 413 F.3d 1069, 1075 (9th Cir. 2005) (Bea, J., concurring). Engquist's challenges to the constitutionality of § 31.735 easily satisfy both prongs of the ripeness test, as the issues presented are purely legal and delay will cause unnecessary hardship. We thus reject Defendants' contention that the claims are unripe.

1002 n.20 (9th Cir. 2003) ("Judicial estoppel prevents a party from taking a contrary position 'where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position.' " (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001))). We reject Engquist's contention that the Department took inconsistent positions. By virtue of its decision to represent Defendants, the Department necessarily held the view that Defendants had not committed "malfeasance in office or willful or wanton neglect of duty." *See* Or. Rev. Stat. § 30.285 (requiring the Department to defend and indemnify state employees, unless it deems that the employees committed "malfeasance in office"). The Department's views did not change during the proceedings below; rather, it was the *jury* that concluded that Defendants acted with "malice" or "reckless and outrageous indifference," such that it found punitive damages were appropriate. *See* Or. Rev. Stat. § 31.730.

Nor did the Department take an inconsistent position when it sought judgment creditor status under § 31.735. The Department did not change its position to one of agreement with the jury determination of willfulness or malice but, because the jury awarded punitive damages, the State Account was automatically entitled to its statutory portion and the Department was separately obligated under § 31.735 to obtain judgment creditor status in order to obtain this statutory portion. Accordingly, we conclude that the district court did not abuse its discretion in rejecting Engquist's judicial estoppel argument.[12]

[12]Engquist's argument that the Department suffered from a conflict of interest is equally without merit. The Department does not have a "proprietary interest" in the State Account because it is not allowed to retain any of the funds for its own benefit or even charge fees to those who apply for funds under the program. *See* Or. Rev. Stat. § 147.315. Nor does the statutory apportionment of a portion of the punitive damages award to the State Account increase the total amount of Defendants' liability; rather, it merely reduces the total amount of Engquist's recovery. Therefore, there

## B.   *Judgment in Favor of a Non-Party*

[15] Engquist next asserts that the district court erred in entering judgment in favor of an entity that was not a party to the proceeding. The Oregon Supreme Court and the district court for the District of Oregon have both held that the State of Oregon can assert its "substantive right as a judgment creditor" pursuant to § 31.735.[13] *See DeMendoza v. Huffman*, 51 P.3d 1232, 1235-36 (Or. 2002); *In re Stein*, 236 B.R. 34, 37 (Bankr. D. Or. 1999). Neither opinion indicates that the State must obtain party status prior to its assertion of this right. The statute's express language, which invites the State to act only "[u]pon the entry of a verdict including an award of punitive damages," belies any inference that the State is required to become a party. Or. Rev. Stat. § 31.735. Additionally, Federal Rule of Civil Procedure 69(a) "permits judgment creditors to use any execution method consistent with the practice and procedure of the state in which the district court sits." *Cigna Prop. & Cas. Ins. Co. v. Polaris Pictures Corp.*, 159 F.3d 412, 421 (9th Cir. 1998) (internal quotation marks omitted). Under Oregon state procedure, the State can merely be identified as a judgment creditor in the judgment and need not intervene as a party. *See DeMendoza*, 51 P.3d at 1235-36; Or. Rev. Stat. § 31.735(2). Therefore, we conclude that Oregon is entitled to assert this substantive right without becoming a party.

---

was no conflict between the Department's representation of Defendants and its subsequent act of seeking an award under § 31.735. *See Kasza v. Browner*, 133 F.3d 1159, 1171 (9th Cir. 1998) (rejecting a plaintiff's "conclusory charge of institutional 'conflict of interest' " against the Department of Justice's representation of the defendants, and also questioning whether a plaintiff even has standing to complain about a conflict of interest on the part of the defendants' counsel).

[13]Section 31.735 was formerly known as § 18.540, and was discussed as § 18.540 in the *DeMendoza* opinion, but the substance of the two statutes is the same.

## C.  Takings Clause Challenge[14]

Section 31.735, which is called a "split-recovery" provision[15] because it apportions the punitive award between the plaintiff and the State, provides in part:

> Upon the entry of a verdict including an award of punitive damages, the Department of Justice shall become a judgment creditor as to the punitive damages portion of the award to which the Criminal Injuries Compensation Account is entitled pursuant to paragraph (b) of this subsection, and the punitive damage portion of an award shall be allocated as follows: [forty percent of the punitive damages award to the prevailing party and sixty percent to the compensation account].

Or. Rev. Stat. § 31.735(1).

**[16]** Engquist argues that § 31.735 violates the Takings Clause of the Fifth Amendment, which forbids the taking of "private property . . . for public use, without just compensation." U.S. CONST. AMEND. V.[16] We use a two-step analysis to

---

[14]While Engquist objected to the "form of judgment" in the district court, it is unclear whether she specifically raised any constitutional objections to § 31.735. The district court never specifically ruled on the constitutionality of the statute. Although the State could have argued that Engquist waived the constitutional issues by not raising them below, it did not. Its failure to raise the waiver argument in its brief to this court means that we can reach the merits of the issue. *See United States v. Doe*, 53 F.3d 1081, 1082-83 (9th Cir. 1995) (holding that the government had waived its waiver argument by failing to assert it and instead addressing the merits of the defendant's claim).

[15]*See, e.g.*, Michael J. Klaben, Note, *Split-Recovery Statutes: The Interplay of the Takings and Excessive Fines Clauses*, 80 Cornell L. Rev. 104 (1994); Scott Dodson, Note, *Assessing the Practicality and Constitutionality of Alaska's Split Recovery Punitive Damages Statute*, 49 Duke L.J. 1335 (2000).

[16]The Takings Clause applies against the states through the Fourteenth Amendment. *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 160 (1980).

determine whether a "taking" has occurred: first, we determine whether the subject matter is "property" within the meaning of the Fifth Amendment and, second, we establish whether there has been a taking of that property, for which compensation is due.[17] *Konizeski v. Livermore Labs (In re Consol. U.S. Atmospheric Testing Litig.)*, 820 F.2d 982, 988 (9th Cir. 1987). The dispute in this case focuses on the first step, *i.e.*, whether a punitive damages award constitutes property under the Takings Clause.[18]

[17] The question of whether punitive damages awards qualify as property for purposes of the Takings Clause is a question of first impression in the federal courts.[19] Two types of Takings Clause cases guide our analysis: cases examining whether principal owners have a property right in interest that accrues on funds held by the government, and cases examining whether a plaintiff has a property interest in a cause of

---

[17]While there is no formulaic test for the first step, there are multiple approaches to the second step of the analysis. One approach, usually applied to regulatory takings, is the "ad hoc" test enunciated in *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104 (1978). As we are focusing on the first step of the takings analysis, we do not engage in analysis of the *Penn Central* factors, even though these factors are discussed by Engquist and several state supreme court decisions. *See, e.g.*, *Kirk v. Denver Publ'g Co.*, 818 P.2d 262, 268 (Colo. 1991); *see also Penn Central*, 438 U.S. at 124 (examining the economic impact of the regulation on the claimant, the "extent to which the regulation has interfered with distinct investment-backed expectations," and the character of the governmental action).

[18]If the punitive damages award does constitute property, it is a "taking" to confiscate 60 percent of it, such that the second prong almost certainly would be satisfied. *See Brown v. Legal Found. of Wash.*, 538 U.S. 216, 235 (2003) ("Because interest earned in IOLTA accounts *is the private property* of the owner of the principal, the *transfer* of the interest to the Foundation here seems more akin to the occupation of a small amount of rooftop space in *Loretto . . .* which was a physical taking subject to *per se* rules." (internal quotation marks and internal citations omitted) (emphasis added)).

[19]Several state supreme courts, however, have decided this issue. *See* Part IV.C.1, *infra*.

action. Both of these two species of Takings Clause cases indicate that the relevant inquiry is the certainty of one's expectation in the property interest at issue. They compel us to conclude that Engquist's interest in her punitive damages award is not a property right cognizable under the Takings Clause, because punitive damages awards are necessarily contingent and discretionary. Our conclusion is bolstered by our consideration of the deterrence and punishment justifications for punitive awards, discussed below, and is in concert with the majority of state supreme courts who have decided the question.

### 1.    Takings Clause Cases

Our analysis begins with the Supreme Court cases holding that interest constitutes property for purposes of the Takings Clause. *Webb's*, 449 U.S. 155, involved a state statute that confiscated for the state the interest accrued on interpleader funds. In concluding that the interest was property under the Takings Clause, the *Webb's* Court emphasized that the creditors at issue had "more than a unilateral expectation" in the interest, and cited the "usual and general rule . . . that any interest on an interpleaded and deposited fund follows the principal." *Id.* at 161-62. The Court emphasized that "earnings of a fund are incidents of ownership of the fund itself and are property just as the fund itself is property." *Id.* at 164. Similarly, in *Phillips v. Washington Legal Foundation*, 524 U.S. 156 (1998), the Court concluded that the interest gained from the "Interest on Lawyers' Trust Account" program involved property for Takings Clause purposes. The Court's reasoning hinged on the "fundamental maxim of property law that the owner of a property interest may dispose of all or part of that interest as he sees fit." *Id.* at 167.

**[18]** While the interest cases do not articulate a general rule for what is cognizable as property under the Takings Clause, the Court's reasoning focused on the certainty of the principal-holder's expectation of receiving interest. Eng-

quist's expectation that she will receive a punitive damages award or the amount of any such award is far less certain than the expectation of interest on principal. Simply put, punitive damages do not follow compensatory damages, as interest follows principal. The interest in *Webb's* qualified as property because of the certainty of the creditor's expectations that it would receive interest, pursuant to the general maxim that "interest follows principal." *See Webb's*, 449 U.S. at 162. In contrast, punitive damages are "never awarded as of right, no matter how egregious the defendant's conduct," in contrast to compensatory damages, which "are mandatory; once liability is found, the jury is required to award compensatory damages in an amount appropriate to compensate the plaintiff for his loss." *Smith v. Wade*, 461 U.S. 30, 52 (1983). Because of the inherently uncertain nature of punitive damages, which are a "discretionary moral judgment" by the jury, *Larez v. City of Los Angeles*, 946 F.2d 630, 648 (9th Cir. 1991) (internal quotation marks omitted), a plaintiff's interest in receipt of any certain amount of punitive damages is too speculative to constitute property under the Takings Clause.

Another category of Takings Clause cases, which examines whether statutory changes to causes of actions can be considered takings, similarly focuses on the certainty of expectations of the person claiming a property interest. We have held that "[t]here is no question that claims for compensation are property interests that cannot be taken for public use without compensation." *Causey v. Pan Am. World Airways, Inc. (In re Aircrash In Bali, Indo. on Apr. 22, 1974)*, 684 F.2d 1301, 1312 (9th Cir. 1982). In that case, however, we did not discuss punitive damages. *Atmospheric Testing Litigation*, 820 F.2d 982, involved a Takings Clause challenge to a statute providing that actions against the United States be the *exclusive* remedy for tort claims against contractors for Hiroshima-related radiation injuries. We relied on the Fifth Circuit's holding that " 'a plaintiff has no vested right in any tort claim for damages under state law.' " *Id.* at 988 (quoting *Ducharme v. Merrill-Nat'l Labs.*, 574 F.2d 1307, 1309 (5th Cir. 1978)

(per curiam)). We further emphasized that the claims asserted by the plaintiffs were "contingent by their nature" and "arise in a field in which the law remains to be developed." *Id.* at 989 (also importing the language of *Penn Central*'s "ad hoc" test in noting that tort claims lack "investment-backed expectations"). Because the tort claims were "contingent by their nature," we concluded that the statute's requirement that claims against the federal government be the exclusive remedy did not constitute a taking. *Id.*; *see also Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 88 n.32 (1978) (rejecting a constitutional challenge to a statutory limitation on liability for nuclear accidents, and stating the "clearly established" principle that "[a] person has no property, no vested interest, in any rule of the common law" and that the "Constitution does not forbid . . . the abolition of old [rights] recognized by the common law, to attain a permissible legislative object").

**[19]** The analysis in *Atmospheric Testing Litigation*, like the Supreme Court's interest cases, focused on the certainty of the plaintiff's expectation that she would receive the property. In contrast to the principal-interest cases, the tort plaintiffs in *Atmospheric Testing Litigation* had a necessarily "contingent" interest in their tort claims, such that the substitution of a different type of remedy did not amount to an unconstitutional taking. As described above, a plaintiff's interest in punitive damages is even more contingent and uncertain than her interest in a tort cause of action, because punitive damages are awarded only if the jury both finds that the defendant's behavior was malicious or reckless *and* decides to invoke its *discretionary* moral judgment against the defendant's conduct. *See Larez*, 946 F.2d at 648 ("the purely discretionary nature of punitive damages required not only a finding that the conduct met the recklessness threshold" but also that the conduct merited punitive damages in addition to the compensatory award, which is a "discretionary moral judgment" (internal quotation marks omitted)); *see also Honeywell v. Sterling Furniture Co.*, 797 P.2d 1019, 1021

(Or. 1990) (" 'The finder of fact must determine what punitive damages, *if any*, to award based on the proper premise of deterring future similar misconduct by the defendant or others.' " (emphasis added) (quoting *State ex rel. Young v. Crookham*, 618 P.2d 1268, 1274 (Or. 1980))). We therefore conclude that a plaintiff's interest in a prospective punitive damages award does not qualify as "property" under the Takings Clause.

### 2.  *Policy of Punitive Damages Awards*

[20] Our conclusion that a plaintiff's interest in receipt of a certain amount of punitive damages is not "property" under the Takings Clause is further supported by consideration of the purposes of punitive damages awards. Punitive damages may be imposed to serve two policy interests: "punishing unlawful conduct and deterring its repetition." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568 (1996). A punitive damages award does not serve any compensatory goals. In the words of the Iowa Supreme Court, "a plaintiff is a fortuitous beneficiary of a punitive damage award simply because there is no one else to receive it." *Shepherd Components, Inc. v. Brice Petrides-Donohue & Assocs.*, 473 N.W.2d 612, 619 (Iowa 1991). As a "fortuitous beneficiary," a tort claimant does not possess an interest cognizable as a property right under the Takings Clause. The Supreme Court has also emphasized that "[i]n our federal system, States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case." *Gore*, 517 U.S. at 568. Given the broad discretion granted to the States in fashioning their punitive damages schemes, we uphold the constitutionality of the Oregon statute against Engquist's Takings Clause challenge.

### 3.  *State Supreme Court Decisions*

Several state supreme courts have ruled upon the constitutionality of "split-recovery" statutes, with six states (Alaska,

Iowa, Indiana, Georgia, Missouri, and Florida) upholding the statutes against federal Takings Clause challenges and two states (Utah and Colorado) holding the statutes unconstitutional. *See* Dodson, *supra*, note 16, 49 Duke L.J. at 1365 n.5 (summarizing state court decisions). The state supreme courts concluded that a plaintiff has no vested right in punitive damages, either (1) because the damages are discretionary and non-compensatory, or (2) because the statutes operate to limit the awards *before* the time of judgment, that is, before the time when a plaintiff's interest vests. *See, e.g.*, *Cheatham v. Pohle*, 789 N.E.2d 467, 474-75 (Ind. 2003); *Evans v. State*, 56 P.3d 1046, 1058 (Alaska 2002); *Mack Trucks, Inc. v. Conkle*, 436 S.E.2d 635, 639 (Ga. 1993); *Gordon v. State*, 608 So. 2d 800, 801-02 (Fla. 1992) (per curiam); *Shepherd Components*, 473 N.W.2d at 619; *but see Smith v. Price Dev. Co.*, 125 P.3d 945 (Utah 2005); *Kirk v. Denter Publ'g Co.*, 818 P.2d 262 (Colo. 1991).[20] Our holding that punitive damages are not cognizable as property under the Taking Clause is therefore in accord with the conclusions reached by a majority of state supreme courts who have considered the issue.

## D.  *Excessive Fines Clause Challenge*

[21] Engquist also contends that § 31.735 violates the Excessive Fines Clause of the Eighth Amendment. That amendment instructs: "Excessive bail shall not be required,

---

[20]The Oregon Supreme Court likewise upheld the constitutionality of its split-remedy statute, but decided the question only under the state constitution. *See DeMendoza*, 51 P.3d at 1245-52. It concluded that a plaintiff does not have a vested prejudgment interest in a punitive damages award, but rather has at most an expectation of such an award. *Id.* at 1245. The two state supreme court cases that concluded that the split-recovery schemes violated the Takings Clause involved a different formulation of the statute. In *Smith* and *Kirk*, the split recovery statutes at issue granted the state an interest in the money *proceeds* from the judgment creditor of the punitive award, rather than an interest in the judgment itself from the judgment debtor.

nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. AMEND. VIII.[21]

The Supreme Court has expressly held that punitive damages awarded to plaintiffs in civil suits do not implicate the Excessive Fines Clause. *Browning-Ferris*, 492 U.S. at 263-64. The language of its holding, however, left open a constitutional challenge to a punitive award when the award serves to benefit the State: "[w]hatever the outer confines of the Clause's reach may be, we now decide only that it does not constrain an award of money damages in a civil suit when the government neither has prosecuted the action *nor has any right to receive a share of the damages awarded*." *Id.* (emphasis added). Because the State here does receive a share of the damages awarded,[22] we must address the question left open by the Supreme Court.

Engquist's contention raises a question of first impression in the courts of appeals.[23] Excessive fines challenges involve

[21]The Supreme Court has never expressly held that the Excessive Fines Clause applies to the States. *See Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 284 (1989) (O'Connor, J., dissenting in part and concurring in part) (noting that the other two clauses of the Eighth Amendment have been applied to the states and "see[ing] no reason to distinguish one Clause of the Eighth Amendment from another for purposes of incorporation," she "would hold that the Excessive Fines Clause also applies to the States"). Without deciding the issue, for purposes of our analysis of Engquist's contention, we assume that the Excessive Fines Clause does apply to the States.

[22]Insofar as the Department of Justice is the judgment creditor, the "State" receives a share of the damages awarded, even though the ultimate beneficiaries are victims of crime and there is no actual benefit to the Department.

[23]Two district court cases have addressed Excessive Fines challenges to split-recovery statutes, but the analysis of neither court provides much guidance. In *Burke v. Deere & Co.*, 780 F. Supp. 1225, 1242 (S.D. Iowa 1991), *rev'd on other grounds*, 6 F.3d 497 (8th Cir. 1993), the court focused on the fact that Iowa's split-remedy statute gave funds *not* to the state, but to a "civil reparations trust fund to be administered by the

a two-step inquiry: (1) whether the Excessive Fines Clause applies, and (2) if so, whether the fine is "excessive." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998) ("Because the forfeiture of respondent's currency constitutes punishment and is thus a 'fine' within the meaning of the Excessive Fines Clause, we now turn to the question whether it is 'excessive.' ").

We reject Engquist's Excessive Fines Clause challenge because the Clause applies only to government acts that are intended to punish, and the split-remedy scheme is not intended to punish Engquist. The *Bajakajian* Court stated that "at the time the Constitution was adopted, the word 'fine' was understood to mean a payment to a sovereign as punishment for some offense." *Id.* at 327-28 (internal quotation marks omitted). "The Excessive Fines Clause thus limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense." *Id.* at 328 (internal quotation marks omitted). *Bajakajian* ultimately concluded that the statutory provision at issue in that case — which required certain felons to forfeit their currency at sentencing — did implicate the Excessive Fines Clause because it was intended to punish. *Id.* at 328.

---

courts." The court decided, based on this observation alone, that the Iowa statute "does not provide the State of Iowa with any interest in the punitive damage award" and therefore that no "excessive fine" had been levied. *Id.* The district court in *McBride v. Gen. Motors Corp.*, 737 F. Supp. 1563, 1578 (M.D. Ga. 1990) seized upon the Court's language in *Browning-Ferris* in holding that Georgia's split-remedy statute had "the constitutional infirmity as set forth in *Browning-Ferris Industries*, because the State of Georgia would have a right to receive a share of the damages awarded and the excessive fines clause of both the state and federal constitutions would be implicated." The *McBride* court, however, misread *Browning-Ferris* in identifying this per se "constitutional infirmity" because the Court had merely left open the question of whether the Excessive Fines Clause would apply when the government receives a share of the award. *See Browning-Ferris*, 492 U.S. at 263-64.

**[22]** Because the Excessive Fines Clause applies only to government action that constitutes "punishment for some offense," *id.*, Engquist, as the plaintiff in the underlying action, cannot succeed on her claim.[24] In a somewhat analogous case, the Court of Federal Claims rejected an Excessive Fines Clause challenge brought by taxpayers who objected to a retroactive tax on their Roth IRA. *Kitt v. United States*, 47 Fed. Cl. 821, 827 (Fed. Cl. 2000), *aff'd*, 277 F.3d 1330 (Fed. Cir. 2002). The court decided that because the imposition of the tax is "unrelated to the taxpayer's culpability" and unrelated to the commission of any "underlying offense," the imposition of the tax is not "punishment" for purposes of the Excessive Fines Clause. *Id.* This reasoning applies equally to the operation of Oregon's split-recovery statute on Engquist's award. No "punishment" of Engquist is involved because operation of the statute is unrelated to Engquist's culpability. Accordingly, we reject Engquist's Excessive Fines Clause argument and affirm the judgment apportioned to the State Account.

## V.   The *Corristan* Verdict

### A.   *Preclusive Effect*

Engquist next contends that the district court erred in ruling that the jury's finding in Corristan's state court case does not have a preclusive effect in Engquist's case. The district court rejected the preclusion argument, stating that "the jurors could find against Ms. Corristan and not necessarily — the defendant with respect to your client. So I am going to deny the motion on that ground." We review *de novo* the district

---

[24]Nor does it appear that a defendant could succeed on such a claim. Because the statute does not increase a given defendant's total liability for punitive damages, but merely re-allocates a portion of the award that would otherwise go to the plaintiff, a defendant is not "injured" by the statute, and therefore, in all likelihood, would lack standing to bring a challenge. *See Smelt v. County of Orange*, 447 F.3d 673, 682 (9th Cir. 2006) (summarizing standing requirements of injury, causation, and redressibility).

court's determination whether a prior decision has preclusive effect. *Jacobs v. CBS Broad. Inc.*, 291 F.3d 1173, 1176 (9th Cir. 2002).

The "full faith and credit" statute compels federal courts to give collateral estoppel and res judicata effects to the judgments of state courts. *Se. Res. Recovery Facility Auth. v. Montenay Int'l Corp.*, 973 F.2d 711, 712 (9th Cir. 1992); 28 U.S.C. § 1738. Because federal courts must give the same full faith and credit to a state court judgment as state courts would give the judgment, the question of issue preclusion is examined under Oregon law. *See id.* at 712-13; *see also Dias v. Elique*, 436 F.3d 1125, 1128 (9th Cir. 2006) (stating that the relevant test in federal court is whether the state court decision "meets the state's own criteria necessary to require a court of that state to give preclusive effect" to the decision) (internal quotation marks omitted).

Under Oregon law, the previous litigation of an issue will preclude re-litigation of the same issue if five elements are met: 1) the issue in the two proceedings is identical; (2) the issue was actually litigated and was essential to a final decision on the merits in the prior proceeding; (3) the party sought to be precluded has had a full and fair opportunity to be heard on that issue; (4) the party sought to be precluded was a party or was in privity with a party to the prior proceeding; and (5) the prior proceeding was the type of proceeding to which the state court will give preclusive effect. *Nelson v. Emerald People's Util. Dist.*, 862 P.2d 1293, 1296-97 (Or. 1993). Additionally, when confronted with an assertion of non-mutual issue preclusion, the court should "scrutinize with care any situation where collateral estoppel is asserted by a [non-party], to make certain no unfairness will result to the prior litigant if the estoppel is applied." *State Farm Fire & Cas. Co. v. Century Home Components, Inc.*, 550 P.2d 1185, 1188 (Or. 1976) (internal quotation marks omitted). The party asserting estoppel has the burden of proving the elements giving rise to it. *Id.*

Here, Engquist, who was not a party to the case brought by Corristan in state court, contends that the state court judgment and verdict from that case should "collaterally estop Mr. Hyatt from denying liability to Ms. Engquist for discrimination based upon race and sex because the factual and legal issues litigated in *Corristan* were identical to those in this case." Engquist's argument fails because the issue of discrimination litigated in the *Corristan* suit is not identical to the issue of discrimination in Engquist's suit.

**[23]** No Oregon cases have addressed issue preclusion in the discrimination context. Oregon courts have, however, articulated a strict standard for the "identity of issues" requirement and require that "the precise question was raised and determined in the former suit." *See State v. Hunt*, 985 P.2d 832, 834 (Or. Ct. App. 1999) (internal quotation marks omitted).

Additionally, the Eighth Circuit rejected an argument nearly identical to Engquist's. *See Anderson v. Genuine Parts Co.*, 128 F.3d 1267, 1272-73 (8th Cir. 1997). The defendant in *Anderson* had demoted its two oldest salespersons, and each of the demoted employees brought suit against the company. *Id.* at 1269-70. In the first suit, the jury found the defendant liable for age discrimination. *Id.* at 1270. In a second suit, Anderson argued that the first verdict should have preclusive effect on the issue of age discrimination. *Id.* at 1273. The court rejected that contention, because Anderson did not satisfy the "identity of issues" requirement: "the jury's finding of age discrimination in [the first plaintiff's] demotion would not necessarily eliminate any nondiscriminatory reasons [the defendant] could assert or the jury could find relating to the separate decision to demote Anderson." *Id.* The court recognized the "numerous similarities" between the two cases, and even acknowledged "the distinct possibility that [the defen-

dant] demoted both men for the same reason," but found the application of issue preclusion would be inappropriate. *Id.*[25]

**[24]** We agree with the reasoning in *Anderson* and reject Engquist's issue preclusion argument because Engquist failed to satisfy the "identity of issues" requirement.[26]

## B.   *Exclusion of the Verdict from Evidence*

The district court granted Defendants' motion in limine to exclude the *Corristan* verdict from evidence and exclude from testimony any mention of the result in *Corristan*. Defendants' motion in limine contended that the evidence from the *Corristan* trial and verdict were "irrelevant to the instant case and admission of this evidence would unfairly prejudice Defendants and confuse the jury." The district court did not articulate its reason for excluding the evidence, but merely stated in an oral ruling that, "[w]ith respect to . . . the *Corristan* trial and verdict, I'm going to grant the motion [in limine], and that will be excluded. Now, if your reasons for referring to it in trial are, for example, for impeachment, for prior inconsistent statements, then we use the term such as 'other proceedings' or 'another,' something of that nature, so as to sanitize the reference to it."

---

[25]The *Anderson* court also distinguished the case before it from *Meredith v. Beech Aircraft Corp.*, 18 F.3d 890 (10th Cir. 1994), a case relied on by Engquist. In *Meredith*, the court applied a jury finding from case one — a finding that the employer had a discriminatory motive in promoting a male employee — to case two, which was brought by a second female employee. The issue was identical in the second case because it involved the employer's motive for promoting the male employee, an issue which remained constant in both cases brought by the female employees. *See Anderson*, 128 F.3d at 1273 (distinguishing *Meredith*).

[26]In addition to the reasons articulated in the text, above, there is now another reason why issue preclusion does not apply here. The *Corristan* verdict rests in part on that jury's finding that Corristan's equal protection and due process rights were violated, rights which we have concluded do not apply in the public employment context, or which the evidence in this case does not support were violated.

We review the district court's evidentiary rulings for an abuse of discretion. *Tritchler v. County of Lake*, 358 F.3d 1150, 1155 (9th Cir. 2004). When the district court fails to make an explicit finding of Rule 403 balancing on the record, however, we review the evidentiary determination *de novo*.[27] *United States v. Boulware*, 384 F.3d 794, 808 n.5 (9th Cir. 2004), *cert. denied*, 126 S. Ct. 337 (2005). In order to establish reversible error, Engquist is additionally required to establish that the error was prejudicial. *Tritchler*, 358 F.3d at 1155. We find prejudice only if the lower court's error more probably than not tainted the verdict. *Mahone v. Lehman*, 347 F.3d 1170, 1172 (9th Cir. 2003).

It is unclear from the record whether the district court's decision to exclude the evidence was based on Federal Rules of Evidence 401/402[28] or Rule 403.[29] Arguments under both rules were raised by Defendants in support of their in limine motion.

**[25]** A state court judgment is relevant evidence and therefore admissible in a later federal suit so long as the judgment has some tendency to prove a fact in issue. *See Boulware*, 384 F.3d at 805. The verdict in favor of Corristan explicitly found

---

[27]*But see McEuin v. Crown Equip. Corp.*, 328 F.3d 1028, 1034 (9th Cir. 2003) (reviewing the district court's decision to exclude evidence for abuse of discretion, rather than *de novo,* even though there was no explicit reference to Rule 403, because "it seems likely that the court was concerned about the prejudicial effect" of the evidence).

[28]" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. "All relevant evidence is admissible. . . ." Fed. R. Evid. 402.

[29]"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

that Defendants "discharge[d] or discriminate[d] against [Corristan] because of her gender or ethnicity." While the jury verdict is not direct evidence of discriminatory behavior toward Engquist, it is relevant evidence in that it has some tendency to make the fact of discriminatory behavior by the same Defendants more probable than without the evidence. *See* Fed. R. Evid. 401 (defining relevance); *see also Boulware*, 384 F.3d at 805. Accordingly, the decision to exclude evidence is not supported by Rule 402.

The district court more likely relied on Rule 403 in deciding to exclude the evidence. Defendants had argued that evidence of the verdict would unfairly prejudice Defendants and confuse the jury. Specifically, Defendants contended that a jury would "likely misconstrue that evidence as proof of discrimination by defendant" or "mistakenly conclude that [the Engquist jury] should reach the same result." In the district court's oral decision to exclude the evidence, the court said the *Corristan* evidence could be used for impeachment purposes, but the parties must use the term " 'other proceedings' or 'another,' something of that nature, so as to sanitize the reference to it." The court's use of the term "sanitize" indicates that its decision was motivated by concerns about undue or unfair prejudice.

Commentators agree that most courts forbid the mention of verdicts or damage amounts obtained in former or related cases. *See* 75A AM. JUR. 2d *Trial* § 628; D.C. Barrett, *Propriety and prejudicial effect of reference by counsel in civil case to result of former trial of same case, or amount of verdict therein*, 15 A.L.R. 3d 1101 (summarizing cases). Moreover, in a case similar to the one at bench, the Third Circuit "disapprove[d]" of the introduction of a prior verdict against the same defendant, because "[a] jury is likely to give a prior verdict against the same defendant more weight than it warrants." *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1351 (3d Cir. 1975). The court specifically noted that "admission

of a prior verdict creates the possibility that the jury will defer to the earlier result." *Id.*

This conclusion runs counter to our conclusion in *Boulware* that a prior state court judgment was admissible under Rule 403 balancing. *See Boulware*, 384 F.3d at 808. The state court judgment in that case, however, posed much less danger of jury confusion than in *Coleman*. In *Boulware*, the district court excluded evidence of a prior state court civil judgment that found the defendant's company owned the money that the defendant gave to his girlfriend. *Id.* at 802. This judgment, had it been admitted, would have been used by the defendant at trial to rebut the government's argument that the defendant personally owed tax liability on that sum of money. *Id.* at 808. We held that, under the circumstances of that case, the trial judge could have easily controlled any danger that the jury would give undue weight to the state court judgment and also controlled any waste of time or confusion of the issues. *Id.*

**[26]** Engquist's case, however, bears much greater similarity to *Coleman* than to *Boulware*. In *Boulware*, the single issue decided by the state court in the earlier case was a distinct civil cause of action that only related to one component of *Boulware*'s criminal prosecution. Such a situation presents a much smaller risk of prejudice or confusion of the issues; additionally, the state court judgment was highly probative of the defendant's tax liability. In the instant case, as in *Coleman*, there was a substantial risk that the jury would import the whole verdict of liability from the prior proceeding. Moreover, the testimony and evidence from the *Corristan* trial, including Corristan's own testimony, was presented to the jury in this case; the only evidence *not* presented to the jury was the *Corristan* verdict. The verdict itself did not possess such additional probative value, beyond the *Corristan* evidence, to overcome the risk of prejudice and confusion that the verdict posed. Accordingly, we conclude that the district court did not abuse its discretion in granting Defendants'

motion in limine to exclude the *Corristan* verdict from evidence.

## CONCLUSION

We reverse the judgment on the constitutional claims because the equal protection claim is invalid as a matter of law, and there is insufficient evidence to support the substantive due process claim. We vacate the damages and attorneys' fees awards, and remand to the district court to determine what portion of these awards can be supported by Engquist's successful state law tort verdict. The district court did not err in awarding a portion of the punitive damages award to the State's Criminal Injuries Compensation Account, and thus we affirm that portion of the judgment. Nor did the court err in declining to give the *Corristan* verdict preclusive effect and in excluding the verdict from evidence. Each party shall bear her or his own costs on appeal.

The judgment is **REVERSED** on the constitutional claims, the damages and attorneys' fees awards are **VACATED,** and the case is **REMANDED** to the district court for further proceedings consistent with this opinion.

---

REINHARDT, Circuit Judge, dissenting:

I dissent. Unlike the majority, I agree with the other circuits that the class-of-one theory of equal protection is applicable to public employment decisions. Accordingly, I would uphold the jury's verdict on the equal protection claim, including its award of $175,000 in compensatory damages and $125,000 in punitive damages. I concur in the majority's holding as to the takings clause issue, although for somewhat different reasons. Thus, I would also affirm the district court's award to Engquist of an additional $50,000, consisting of forty percent of the total $125,000 punitive damages awarded in connection

with the state law claim. Because I would uphold the jury verdict in its entirety, I would not remand the case to the district court.

The majority's holding relating to the class-of-one theory of equal protection creates inter-circuit conflict, is at odds with the precedent of the Supreme Court and of this circuit, and is not justified by the policy concerns raised by the majority. Every other circuit to have considered this question has applied the class-of-one theory to employment. *See, e.g., Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006); *Whiting v. Univ. of S. Mississippi*, 451 F.3d 339, 348-50 (5th Cir. 2006); *Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250, 260-61 (6th Cir. 2006); *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005); *Levenstein v. Salafsky*, 414 F.3d 767, 775-76 (7th Cir. 2004); *Campagna v. Massachusetts Dep't of Envtl. Prot.*, 334 F.3d 150, 156 (1st Cir. 2003); *Bartell v. Aurora Pub. Sch.*, 263 F.3d 1143, 1149 (10th Cir. 2001). Even before the Supreme Court articulated the class-of-one principle in *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000), other circuits recognized it as a straightforward application of equal protection principles. *See, e.g., Ciechon v. City of Chicago*, 686 F.2d 511, 522-23 (7th Cir. 1982).

The majority's position is also at odds with the approach taken by this circuit. Until now, we have recognized that a class-of-one equal protection claim is no different from any other equal protection claim that does not involve a protected class. For example, *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936 (9th Cir. 2004), which applied the class-of-one theory to the differential enforcement of environmental regulations on ski resorts, employed the rational basis test defined in *Armendariz v. Penman*, 75 F.3d 1311 (9th Cir. 1996) (en banc), the same test that we employ in other equal protection cases. *See also Valley Outdoor Inc. v. City of Riverside*, 446 F.3d 948, 955 (9th Cir. 2006); *Seariver Mar. Fin. Holdings Inc. v. Mineta*, 309 F.3d 662, 679-80 (9th Cir. 2002). Although this circuit has not previously considered the class-

of-one theory in the employment context, nothing in our earlier cases suggests that, contrary to the view of all the other circuits to have considered the question, it is not applicable to employment cases. Indeed, the majority does not identify a single case in our equal protection jurisprudence or that of any other circuit that limits equal protection rights in the context of public employment.

The majority's approach is also at odds with Supreme Court precedent. The Supreme Court has made clear that people have a right not to be singled out by the government for arbitrary and irrational treatment. *Olech*, 528 U.S. at 564. Of course, courts must be most cautious, and apply a higher standard of review, when the government treats groups differently on the basis of certain protected characteristics; but even when a protected class is not involved, government actions must be supported by a rational basis. *City of Cleburn v. Cleburn Living Ctr.*, 473 U.S. 432, 448-49 (1985). Thus, we must find that an employee's equal protection rights are violated when he is "intentionally treated differently from others similarly situated and . . . there is no rational basis for the difference in treatment." *Olech*, 528 U.S. at 564.

The majority attempts to distinguish *Olech* because that case involved a regulatory decision, rather than an employment decision. The majority argues that a distinction in treatment under the equal protection clause between employment and regulatory actions is justified because the state has greater powers when it acts as a regulator than when it acts as an employer. The majority is correct that there are differences between the state's powers in the two realms. However, unlike in the First and Fourth Amendment contexts, upon which the majority relies, the Court has not limited the Fourteenth Amendment's scope as applied to public employment. *See Washington v. Davis*, 426 U.S. 229 (1976); *see also Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 728-29 (2003) (applying gender-based equal protection case law from outside the employment context to public employees). Few

circuit courts have given any consideration to the idea that the class-of-one doctrine does not apply to employment, and none has ever so held. Furthermore, even in the First and Fourth Amendment contexts, in which courts have concluded that some limitations on individual rights are necessary to facilitate government employment, federal employees do not give up their rights to be free from hostile, arbitrary, and malicious treatment by the government. *See Garcetti v. Ceballos*, 126 S.Ct. 1951, 1958 (2006) ("[P]ublic employees do not surrender all their First Amendment rights by reason of their employment."); *Nat'l Treasury Employees Union v. Von Raab,* 489 U.S. 656, 664 (1989) ("Our earlier cases have settled that the Fourth Amendment protects individuals from unreasonable searches conducted by the Government, even when the Government acts as an employer.").

Although the majority acknowledges that its position is at odds with that uniformly taken by other courts, it disregards this conflict because it is needlessly concerned that the class-of-one rule would eliminate at-will employment. There is no cause for the majority's concern. The application of class-of-one equal protection principles is hardly fatal to at-will employment. The rational basis test has always been used to insulate governmental decisions from searching review that would interfere with governmental functions, while still protecting individuals against heinous governmental conduct. The rational basis test can play this role as successfully here as in other equal protection cases. It is certainly not necessary, in order to preserve the concept of at-will employment, to hold that the government may freely treat its employees maliciously and irrationally.

The majority, nevertheless, views the requirement set forth in *Squaw Valley* that government conduct not be "malicious, irrational, or plainly arbitrary" as inherently at odds with at-will employment. It apparently believes that arbitrary treatment of public employees is a necessary and acceptable part of public employment. I disagree. Moreover, the *Squaw Val-*

*ley* test is not as threatening to at-will employment as the majority believes: it would not render all discharges that are not for just cause unconstitutional. Rather, in the present context as in the context of statutory interpretation, "plainly arbitrary" must be construed in relation to the other words in the clause. *See United States v. King*, 244 F.3d 736, 740-41 (9th Cir. 2001) ("[W]ords are to be judged by their context and . . . words in a series are to be understood by neighboring words in the series." (quoting *United States v. Carpenter*, 933 F.2d 748, 750-51 (9th Cir. 1991))). Accordingly, actions are "plainly arbitrary" in the sense of being violative of the equal protection clause only if they include an element akin to irrationality or malice. Thus, for example, an employer would not violate the equal protection clause if he were to lay off every fifth employee, even though the selection criteria might appear rather arbitrary in the non-contextual sense of the term. It would, in contrast, be a violation of the plainly arbitrary provision if a supervisor were summarily to fire an employee because the employee's sister refused his sexual advances.

Moreover, the experience of other circuits demonstrates that the class-of-one theory of equal protection is not in practice fatal to at-will employment. The seven circuits that have recognized the theory continue to have at-will employment. The government is able to terminate employees in these circuits for no reason, or for any reason that does not violate the equal protection clause. Nor are those circuits drowning in the "flood" of class-of-one employment disputes feared by the majority. Rather, as the majority notes, those circuits have set standards for assessing class-of-one employment disputes such that petitioners win only in extreme cases. The lack of success of most plaintiffs in these circuits demonstrates the ability of the courts to allow for recovery under the class-of-one theory without constitutionalizing every employment dispute.

The courts that have considered the application of the class-of-one theory to employment have used three, overlapping

techniques to limit its reach. The Second Circuit, and the Seventh Circuit have, in some instances, required the petitioner to identify an identically situated individual who was not discriminated against. *See, e.g., Neilson*, 409 F.3d at 104; *Indiana State Teachers Ass'n v. Bd. of Sch. Comm's*, 101 F.3d 1179, 1181-82 (7th Cir. 1996). Others require a showing of animus or malice. *See Jennings v. City of Stillwater*, 383 F.3d 1199, 1211 (10th Cir. 2004) (applying this standard and collecting cases). The third group applies the rational basis test, putting the burden on the petitioner to disprove any rational reasons brought forward by the petitioner. *See, e.g.*, *Whiting*, 451 F.3d at 349; *Lauth v. McCollum*, 424 F.3d 631, 634 (7th Cir. 2005).

The best approach, that adopted by this circuit in a regulatory case, *Squaw Valley*, authored by Judge Tashima, includes aspects of all three techniques. A plaintiff must show both that he was treated differently than others and that there was no rational basis for this treatment. *Squaw Valley*, 375 F.3d at 944 (quoting *Olech*, 528 U.S. at 564). A plaintiff can show that he was treated differently either by comparing his treatment to that of someone very like himself, or by showing that the government's treatment of him was motivated by undeserved malice.[1] *See Squaw Valley*, 375 F.3d at 945, 947 (finding no similarly situated comparator but still finding for the plaintiff under a class-of-one theory because the defendant "harbor[ed] actual 'hostility' and 'antagonism' " for the plaintiff). There is no need for an identically situated comparator in cases involving malice because the government does not ordinarily treat people maliciously, and, thus, is obviously treating individuals unequally under such circumstances.[2] *Id.*

---

[1]This is not to say that an employer cannot act on his dislike of an employee where that dislike has its roots in the employee's mediocre performance or lack of initiative, or in some other response to the individual not based on malice or irrationality, even if the employee has met the minimum requirements of the job.

[2]Although the majority believes that requiring malice would be inconsistent with *Olech*, I do not suggest such a requirement here. I simply assert that a showing of malice as the cause is enough to show that an individual was subjected to differential treatment.

The plaintiff can show that no rational basis exists in a class-of-one case by showing than an "asserted rational basis was merely a pretext for different treatment." *Squaw Valley*, 375 F.3d at 945-46 (internal quotations omitted). Such pretext may be shown by demonstrating "either: (1) the proffered rational basis was objectively false; or (2) the defendant actually acted based on an improper motive." *Squaw Valley*, 375 F.3d at 946. As to the second prong, reasons that are "malicious, irrational or plainly arbitrary" cannot provide a rational basis. *Armendariz*, 75 F.3d at 1326; *see also Cleburn Living Ctr.*, 473 U.S. at 448-49; *Scarbrough*, 470 F.3d at 261. Thus, malice can in some circumstances serve as a basis for showing both disparate treatment and lack of rational basis.

Under this test, I would affirm the district court's determination that Engquist's equal protection rights were violated. Engquist presented her case on the theory that Szczepanski and Hyatt were acting out of malice. The jury agreed, finding that Engquist's termination was "arbitrary, vindictive or malicious." Accordingly, Engquist has demonstrated that she was singled out to be the target of government malice and that this malice was the cause of her termination.[3]

I see no reason to abandon the test that Judge Tashima thoughtfully endorsed for the court in *Squaw Valley*. I certainly would not reject it in favor of a rule that conflicts with that adopted by every other circuit to consider this question. Accordingly, I dissent from the majority's reversal of the finding of liability on the equal protection count and would affirm both the compensatory and punitive damages in that regard.

---

[3]I note that the majority objects only to the class-of-one theory and does not argue that, if such a standard is applicable, Engquist failed to assert sufficient evidence to establish a violation. The State likewise focuses its attack on the class-of-one theory and raises a sufficiency of the evidence claim only as to Engquist's failure to point to any individual situated identically to herself. As I note, however, an identically situated comparator is not required in cases of malice.

On the takings clause question, I agree with the majority's holding that the punitive damages provisions of Oregon law do not violate the takings clause. I reach this conclusion because the plaintiff has no interest at all in punitive damages, which exist to punish the defendant rather than to reward the plaintiff, unless and until such interest is created by state law.[4] Under its statute, Oregon chose to give the plaintiff an interest in only forty percent of the amount that the jury assesses against the defendant on a state claim for malicious conduct. The plaintiff is never afforded possession of or any right to the other sixty percent of the award, as that money is awarded directly to the state in the court's judgment. Under such circumstances, the majority is correct that the plaintiff has no property right in that other sixty percent. Accordingly, I concur in the majority's holding and would leave Engquist's forty percent punitive damages award on the state claim unchanged.[5]

In sum, I would conclude that the district court did not err in holding that Engquist's equal protection rights were violated and would affirm the award of general and punitive damages on the basis of that claim.[6] I would also affirm the apportionment of the punitive damages relating to the state law claim. Because I would uphold the general and punitive damages on the equal protection grounds and the apportionment of the punitive damages on the state law claim, I would

---

[4]A different rule might apply if the state took a share of punitive damages awarded under federal law, but that is not at issue in this case.

[5]Like the majority, I reject Engquist's other arguments relating to the apportionment of punitive damages.

[6]I agree with the majority as to the substantive due process claim. However, because the damages for the substantive due process violation were merged into the larger sums awarded for the equal protection clause violation, my conclusion as to the equal protection clause is sufficient to support the entire federal damages award. Thus, the majority's conclusion as to substantive due process does not affect the outcome in any manner.

I likewise agree with the majority's conclusions relating to the exclusion of the Corristan verdict.

affirm the district court judgment in its entirety. I respectfully dissent.